**Khoa Dang NGUYEN, Petitioner,**

v.

**Joseph McGRATH, Warden, Respondent.**

No. C 03–093–CRB.

United States District Court, N.D. California.

May 28, 2004.

George F. Hindall, Office of the Attorney General, San Francisco, CA, for respondent.

Khoa D. Nguyen, Pelican Bay State Prison, Crescent City, CA, pro se.

Vince Chhabria, Covington & Burling, San Francisco, CA, for petitioner.

## MEMORANDUM AND ORDER GRANTING PETITION FOR HABEAS CORPUS

BREYER, District Judge.

Over five years ago, a Santa Clara County jury convicted petitioner Khoa Dang Nguyen of three counts of first degree murder. A key piece of evidence against Nguyen was his tape-recorded confession to the crime. On direct appeal, the California Court of Appeal ruled that the confession was elicited in violation of Nguyen's *Miranda* rights and should not have been admitted at trial. The court nonetheless upheld Nguyen's conviction on the ground that the admission of the confession was harmless error.

Now pending before this Court is Nguyen's petition for a writ of habeas corpus. The question before this Court is not whether Nguyen is guilty or innocent; rather the question is whether the California Court of Appeal's ruling that the admission of Nguyen's confession was harmless error was an objectively unreasonable application of clearly established federal law. After reviewing the papers filed by the parties and the trial transcript, and having had the benefit of oral argument, the Court concludes that the California Court of Appeal's ruling was objectively unreasonable and, therefore, the petition must be granted.

## BACKGROUND

■ The following summary of the facts of this case is based on the statement of facts presented in the California Court of Appeal's opinion, *People v. Khoa Dang Nguyen, et al,* No. H019770, slip op., *2–*5 (Cal.Ct.App. August 30, 2001), and the Santa Clara County Superior Court trial transcripts. In reviewing the state appellate court's harmless error determination, this Court viewed the evidence presented at trial in the light most favorable to the prosecution. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ("Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.").

## I. The Murders

The events leading to petitioner's conviction began shortly after midnight on March 11, 1995 when Cuong Do ("Cuong"), a reputed member of the Asian Boys ("AB") gang, was shot at a nightclub in San Jose. After the shooting, several individuals who had been present when Cuong was shot, along with other friends and fellow gang members of Cuong, gathered at petitioner's house. An angry discussion ensued. Some of those present talked about getting the person who shot Cuong. Then, sometime around 2:00 a.m., the group was apparently told that the people responsible for the shooting were at the May Tim Café. Petitioner, Khanh Hinh ("Khanh"), Ho Thai Nguyen ("Ho"), Son Troung Nguyen ("Son"), Sunny Van Nguyen ("Sunny"), Jefry Subana ("Subana"), Senh Duong ("Senh") and Quang Minh Tran ("Quang"), armed themselves and drove to the May Tim Café.

While the rest of the group waited in the parking lot, Ho went inside the May Tim Café. Three young Vietnamese men—Tri Le ("Le"), Truc Nguyen ("Truc"), and Andy Vu ("Vu")—were sitting in the café's video game room. Truc was wearing a brown raincoat. Ho came out and talked to the group. Then, Ho and five or six other individuals, one armed with a shot-

gun and the others armed with handguns, entered the cafe. They began firing. Le, Truc and Vu were shot and killed. All of the shooters fled the scene.

## II. The Investigation

Shortly after the shootings, San Jose police investigators questioned petitioner and others believed to be involved in the shootings. They also interviewed several friends and acquaintances of the defendants, including Long Ngo ("Long"), Nam Duong ("Nam"), Linh Nguyen("Linh") and Nick Dang ("Dang"), who were present that night at petitioner's house or the May Tim Café. In addition, the police obtained a warrant to search the residence of Lap Tran, where they found a shotgun and several handguns. No fingerprints were found on the guns.

On March 14, 1995 at approximately 4 p.m., petitioner was brought to the police station. Ten hours later, at 2 a.m., Sergeant Chuck Hahn ("Hahn") began to question him. Shortly thereafter, the petitioner made a statement. In the redacted statement that was admitted as evidence at trial, petitioner told police the following: He was at his house when some of his friends came over and told him that Cuong had been shot earlier that night. Clerk's Transcript ("Clerk's Tr.") at 514–16. He became angry and upset because Cuong was "like a brother" to him. *Id.* at 517. His friends were also angry and upset. *Id.* at 518. His friends did not know who shot Cuong, but someone said the shooter had been wearing a brown or mustard-colored shirt or jacket. *Id.* at 520. Petitioner's friends wanted to drive around and look for the person responsible for the shooting, but he told them to wait since they did not know where to look. *Id.* at 518. Then, someone phoned or came over, and said that the person responsible for Cuong's shooting was at the May Tim Café. *Id.* at 519. Sometime around 2 a.m., he got into a car with three of his

friends and drove to the May Tim Café. *Id.*

After initially denying that he entered the May Tim Café, petitioner admitted he and some of the others entered the café armed with guns, *id.* at 529; that he was the only person armed with a shotgun, *id.* at 538; and that he pointed his shotgun toward the game room and fired once, *id.* at 537. Petitioner claimed that he closed his eyes when he fired his shotgun and did not see whether he hit anyone. *Id.* at 538.

## III. The Trial

On September 30, 1976, petitioner and seven co-defendants were each charged with three counts of murder with a multiple murder special circumstance. It was further alleged that petitioner and five of the other co-defendants had personally used a firearm in the commission of the crime. The defendants were later severed into two groups and tried in Santa Clara County Superior Court. Petitioner was tried with Khanh, Ho, Son, and Sunny.

### A. The Prosecution's case

At trial, the prosecution based its case on the theory that the murders at the May Tim Café were "a gang style execution" committed in retaliation for the shooting of Cuong. Reporter's Trial Transcript ("Trial Tr.") at 1455. In his opening statement, the prosecutor told the jury that defendants were motivated by "intense loyalty, either out of friendship or for gang involvement to" Cuong. Reporter's Transcript, Jury Selection and Opening Statements ("Opening Statement") at 414. In closing, the prosecutor explained:

All the evidence is that Ho Nguyen is [a gang member], but that Cuong Do got a lot of respect, and these defendants all knew him and retaliated for that reason. And it's this type of triple murder killing two innocent people for the price of one

that makes that kind of statement, that makes gangs feared and the reason the defendants did in this case. That's the only explanation. Trial Tr. at 1456. The prosecutor added that Cuong was shot because of "a gang war that was going on between the Asian Boys and [Asians Kicking Ass].... That's what the motive is in this case." *Id.* at 1791. Later, he also told the jury that, in shooting the three victims in the May Tim Café, the defendants were "making a statement of power intimidation, retaliation for the Asian Boys gang." *Id.* at 1792. In his closing, however, the prosecutor conceded that petitioner was not a member of the AB or any other gang. *Id.* at 1455–56, 1793.

To support the charges of first degree murder, the prosecutor argued that the murders were "part of an ongoing conspiracy ... that was started" at Khoa's house. *Id.* at 1470, 1473. As further support for the argument that the murders were premeditated, the prosecutor emphasized that, as the defendants entered the café, they covered their faces and guns in order to shield them from the café's video security cameras. *Id.* at 1460, 1475, 1784–85.

The prosecution relied heavily on petitioner's statement to the police to prove that he planned and participated in the murders. In his opening statement, the prosecutor said:

Khoa Nguyen is interviewed on March 15th....

... He was at home ... when people came over after 12:30, after 1:00 in the early morning hours. He admits that a bunch of friends did come over, and they left home around 2:00 a.m.

He is not in the AB gang, but he admits that Cuong Do was like a brother to him. When the police ask him about that relationship, he said he was very friendly with him.

He and his friends were mad and wanted to drive around and look for Cuong Do's shooter, someone he doesn't know who told him the shooter was at the May Tim Café and he heard he wore a brown jacket.

He initially doesn't tell the police all the truth. He says he doesn't know what happened at the May Tim Café, but when pressed, he remembers that someone did go inside and come out.

CQ was there, and at some point in time, someone said, let's go. He went in with the others ... and someone fired....

Later on, he admits he did fire his shotgun, one round of that shotgun. He doesn't have any idea, doesn't know if this is Cuong Do's shooter or not that he killed, but he himself was responsible for the death of one person directly...."

Opening Statement at 441–42.

In his closing argument, the prosecutor asked rhetorically, "Who describes the conspiracy at Khoa's house?" Trial Tr. at 1471. Answering his own question, he told the jury: "We have three witnesses, Khoa himself admits his own involvement being in the house and seeing his friends came [sic.] over and talk about Cuong Do's shooting." *Id.* Later in his closing, the prosecutor said:

Next let's talk about Khoa Nguyen. You will get a chance to listen to the tape. I think you will see that Khoa consistently refuses to tell the truth. The police have to drag it out of him.

You will see he's loyal. He doesn't want to snitch or give information that will help the police. That's because he's a remorseless, cold-blooded, shotgun murderer. You will hear from his own words, his lack of remorse.

He says on page 22, this is not about remorse, the reasons why he's telling the police this. The police have to work

him over. They have to suggest to him he's upset about his friend Cuong Do being shot. That's understandable, and they try to drag it out the best they can.

Page 43. How do you feel about shooting these victims? He says he felt nothing until afterwards.

Page 44. He says I didn't even know, I don't know if it was the right guy. Police ask, is that what hurts? He says, I just didn't do it right.

. . .

He admits he didn't drink or do anything. There's nothing wrong with his memory....

*Id.* at 1487–88.

The other evidence presented to the jury that petitioner planned and participated in the murders consisted of video tapes from security cameras at the May Tim Café and the statements and testimony of four witnesses. The video tapes showed people gathering in the parking lot the night of the murders and entering and exiting the cafe. But, as the prosecutor told the jury in his opening statement, they are "terrible quality." Opening Statement at 418. They consist of split shots, "two seconds here, two seconds there," from four cameras, two inside the café and two outside the cafe. *Id.* at 418–19.

Except for petitioner's statement, the prior statements of Long and Nam were the only evidence presented to the jury to prove that petitioner participated in planning the murders at his house before the defendants drove to the May Tim Café. Long testified that, after Cuong was shot, he went to petitioner's house, and petitioner and several other defendants were there. Trial Tr. at 603–10. During direct examination by the prosecutor, Long said he did not recall any one present that evening talking about "going out and getting the guy who shot Cuong Do." Trial Tr. at 612. But he admitted that he had

previously testified at a preliminary hearing that "everyone there was yelling and screaming out of anger and they were mad that Cuong Do had been shot." *Id.* at 613–14. He also admitted to having previously testified at a preliminary hearing that he had seen a shotgun in petitioner's bedroom that night. *Id.* at 614. On direct examination, Nam testified that he was at petitioner's house on the night of the shooting. *Id.* at 821. But he said he did not recall having previously told police that he remembered hearing petitioner and Subana talk about shooting the guy who had shot Cuong. *Id.* at 830.

Except for petitioner's statement, Nick Dang was the only witness who told the jury that petitioner was present at the May Tim Café on the night of the murders. Dang, who was 15 years old, testified that he was in a car that arrived at the May Tim Café when the defendants were already in the parking lot. *Id.* at 501. Dang testified that, while he was sitting in the car parking lot, he saw petitioner standing in the parking lot with a shotgun. *Id.* at 524, 552. But Dang also testified he did not see any of the defendants enter the May Tim Café. *Id.* at 551.

Except for petitioner's statement, the security camera video tapes were the only other evidence presented to the jury to prove that, on the night of the shooting, petitioner carried a shotgun into the May Tim Café. In his opening statement to the jury, however, the prosecutor noted that the people on the video tapes "are grainy, shadowy figures," Opening Statement at 418, and he told the jurors that Ho was the only defendant who they were likely to be able to identify on the video tapes, *id.* at 419. Sergeant Don Moore testified that, some time after the killings, Linh, defendant Ho's sister, identified petitioner as the person carrying the shotgun on the video tape. Trial Tr. at 1270. On direct

and redirect examination, however, Linh testified that she did not recall identifying petitioner on the video tape. *Id.* at 897.

During his opening statement, the prosecutor played a segment that showed people entering the café just before the shooting. He told the jury that the second person to enter was petitioner. "[H]e's a person who is carrying a long weapon, a black hand held shotgun, which you will see here in court. It's basically hidden in a coat. I believe you can see that as he walks in, and certainly as he returns out, you will see the shotgun being held up in the air." Opening Statement at 426–27. During his closing argument, the prosecutor played the segments of the video tape that, he suggested to the jury, showed petitioner covering a shotgun up with a shirt or jacket and carrying it into and out of the May Tim Café. Trial Tr. at 1468. In one segment, an individual, who the prosecutor identified as Ho, takes off a dark jacket and hands it to an individual who the prosecution suggested was petitioner. *Id.* at 1469.

### B. The Defense

The defense moved in limine to suppress petitioner's statement on the ground that petitioner had been denied his *Miranda* rights. Clerk's Tr. at 179–95. The trial judge denied this motion. Trial Tr. at 176. Petitioner's attorney then chose to present a manslaughter defense. In his opening statement, the defense quoted large segments of petitioner's statement to the police. Petitioner's attorney explained to the jurors, "I'll give you portions of what's said because I think that's going to come into evidence and I think that will explain the structure of what happened to Khoa, what Khoa did, why Khoa is here in this room right now." Opening Statement at 456. The sections that the defense read to the jury included petitioner's statement that Cuong was like a brother to him, *id.* at 457; that Cuong's shooting made him

"very mad," *id.* at 458; that somebody told petitioner the person who shot Cuong was wearing a brown or mustard-colored jacket, *id.* at 459; and that someone came to petitioner's house and told them the guy shot Cuong was at the May Tim Café, *id.* at 459–60.

In closing argument, the defense argued that petitioner was guilty only of manslaughter because he acted in the heat of passion, out of anger over the shooting of his friend Cuong. Trial Tr. at 1583. Petitioner's attorney summed up the actual murder as follows: Khoa "ends up at the May Tim Café. Somebody says, let's go. He goes in. Somebody says, that's the guy, and he pulls the trigger." *Id.* at 1598. The defense also challenged the prosecutor's theory that the murders were gang-related, emphasizing that neither petitioner nor Truc, who was killed by the shotgun blast, were members of a gang. *Id.* at 1558.

Petitioner's attorney and the attorneys for the other defendants also challenged the testimony of the four witnesses who implicated petitioner in the murders. During cross-examination, Long, who was granted immunity, told the jury that, on the evening of the murders, he drank four shots of tequila and four beers, and took Ecstasy. *Id.* at 634–37. He could not remember who drove him to petitioner's house that evening, and eventually passed out there. *Id.* at 638–39. Although he testified that he had previously seen a long gun under petitioner's bed, he told the jury he was not sure whether the gun he saw was a shotgun or a BB gun he knew Khoa had in his room. *Id.* at 654–55. In addition, under direct examination, Long testified that, when he was interviewed by the police, they "put words in my mouth." *Id.* at 606.

Nam testified that he had also consumed numerous tequila drinks and beers before

going to petitioner's house. *Id.* at 872. He also told the jury that he did not remember telling police that "it was Khoa and Jeff who were drunk who talked about doing a shooting." *Id.* at 830. In addition, he said under cross-examination that it was only in response to Sergeant Hahn's listing of the names of those present that he had singled petitioner out as one of those who had mentioned getting the people that shot Cuong. *Id.* at 846–47. Under cross-examination, Sergeant Hahn also testified that when he interviewed Nam, he had threatened to arrest him. *Id.* at 967.

Dang was also granted immunity for his testimony. *Id.* at 536. Under cross-examination, he told the jury that he had been drinking heavily that night and eventually passed out in the car. *Id.* at 555. He also admitted to having previously lied and made stuff up to protect himself. *Id.* at 537, 567.

At trial, Linh never recalled identifying petitioner as the person with the shotgun on the video. *Id.* at 897, 913. During cross-examination, she acknowledged that, before looking at the video tape at the police station, she had read police reports about the shootings and that the police had shared with her their opinions about who appeared in the videos. *Id.* at 926.

### C. The Verdict

After deliberating for seven days, the jury found petitioner and two other defendants—Ho and Sunny—guilty of three counts of first degree murder with the special circumstance of using a gun. The jury found Son guilty of three counts of second degree murder. The jury was unable to reach a verdict on Khanh and the trial judge declared a mistrial. The trial court subsequently sentenced petitioner to state prison for three consecutive indeterminate terms of life without possibility of parole, plus three consecutive determinate terms of ten years (thirty years total) for the gun-use enhancements.

### IV. The Appeals

Petitioner appealed his conviction to the California Court of Appeal. On August 30, 2001, the state appellate court found that the admission at trial of petitioner's statement to the police was a violation of his *Miranda* rights, but the court found that the error was harmless and affirmed the verdict. Petitioner filed for review in the California Supreme Court. On November 28, 2001, the state supreme court denied review. On March 5, 2003, petitioner filed the instant federal habeas petition. In his petition, he raises two claims: first, that the admission of his statement to police in violation of his *Miranda* rights was not harmless error; and second, that he was denied his right to due process and a fair trial by the trial court's admission of gang affiliation evidence.

### DISCUSSION

### I. Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d).

■ "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The only definitive source of clearly established federal law under 28 U.S.C. section 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *See id.* at 412, 120 S.Ct. 1495; *Clark v. Murphy,* 331 F.3d 1062, 1069 (9th Cir.2003). "A state court's decision is not 'contrary to ... clearly established Federal law' simply because the court did not cite ... opinions" of the Supreme Court of the United States. *Mitchell v. Esparza,* 540 U.S. 12, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003) (per curiam) (citing *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002)). "A state court need not even be aware of [Supreme Court] precedents, 'so long as neither the reasoning not the result of the state-court decisions contradicts them.'" *Id.*

"Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of

clearly established federal law was "objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495; *see also Lockyer v. Andrade,* 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (rejecting the Ninth Circuit's use of a clear error standard because it fails to give proper deference to state courts by conflating error with unreasonableness). "In assessing whether an application of federal law is objectively unreasonable, courts will often have to engage in an intensive fact-bound inquiry highly dependent upon the particular circumstances of a given case." *Chia v. Cambra,* 360 F.3d 997, 1002 (9th Cir.2004). "Although only Supreme Court law is binding on the states, [Ninth] Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable." *Id.* at 1002–03 (quoting *Himes v. Thompson,* 336 F.3d 848, 853 (9th Cir.2003)).

■ Even if a state court decision is contrary to, or involves an unreasonable application of, clearly established United States Supreme Court precedent, federal habeas relief is warranted only if the error was not harmless. *See Penry v. Johnson,* 532 U.S. 782, 795, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001). Prior to passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), on federal collateral review the test for harmless error was whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (holding that the "less onerous" substantial-and-injurious harmless error standard established by *Kotteakos v. U.S.,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) is better tailored to the nature and purpose of collateral review than the "harmless beyond a reasonable doubt" standard established by *Chapman v. California,* 386 U.S. 18, 24, 87

S.Ct. 824, 17 L.Ed.2d 705 (1967)). Following the majority of other circuits, the rule in the Ninth Circuit has been that "federal district courts always should apply the *Brecht* standard ... regardless of what, if any, type of harmless error review was conducted by the state courts." *Bains v. Cambra,* 204 F.3d 964, 977 (9th Cir.2000) (citing the 3rd, 4th, 5th, 6th, 7th, 10th and 11th circuits as having already established this rule).

While the standard of review of a harmless error question appears settled in the Ninth Circuit, recent Supreme Court cases have created some uncertainty. In *Penry,* the Supreme Court said that if a federal court found constitutional error, that error could justify overturning a death sentence only if the defendant "could establish that the error had substantial and injurious effect or influence in determining the jury's verdict." 532 U.S. at 795, 121 S.Ct. 1910 (quoting *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710). More recently, in *Esparza,* the Supreme Court seemed to hold that, instead of independently applying *Brecht,* federal courts should apply the objective unreasonableness test to a state appellate court's application of *Chapman.* 540 U.S. at ——, 124 S.Ct. at 12 ("We may not grant respondent's habeas petition, however, if the court simply erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' manner."). The Ninth Circuit has suggested in dicta that *Esparza* should not be interpreted as establishing a new standard for harmless error analysis on habeas review. *See Picazo v. Alameida,* 366 F.3d 971 (9th Cir.2004) ("Given that *Esparza* did not even mention *Brecht,* or its progeny, ... we do not believe that the [Supreme] Court intended to overrule those earlier decisions.") (citations omitted). This Court need not determine whether *Esparza* established a new standard for

collateral review of harmless error because the Court concludes that, in this petitioner's case, the California Court of Appeal's application of the harmless error rule was objectively unreasonable even under the "less onerous" *Brecht* standard.

## II. The *Miranda* Violation

Petitioner argues that his statement to the police should have been suppressed on two grounds. First, because he was not properly informed of his right to an attorney, he argues that his statement was taken in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In addition, he contends that the statement should have been suppressed because it was involuntary and hence inadmissable. In his brief, respondent concedes that, "as the California Court of Appeal concluded, petitioner's statement to the police should have been suppressed on the ground that it was obtained in violation of the requirements of *Miranda.*" Memorandum of Points and Authorities in Support of Answer ("Answer") at 19. Respondent nonetheless argues that the admission of the statement was harmless error. *Id.* With regard to the involuntariness claim, respondent contends that petitioner failed to exhaust his state claim, *id.* at 20, and also argues that petitioner's statement was not involuntary, *id.* at 21. Since respondent does not dispute that the statement was inadmissable under *Miranda* and, following *Arizona v. Fulminante,* 499 U.S. 279, 303, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the harmless error standard would apply regardless of whether the error was a violation of *Miranda* or a violation of the constitutional rule against the admission of involuntary confessions, this Court does not need to consider petitioner's involuntariness claim.

On review, the California Court of Appeal held that admission of petitioner's

statement was harmless error. The court explained:

> Nevertheless, the error was harmless beyond a reasonable doubt. [*Chapman*, 386 U.S. at 24, 87 S.Ct. 824.] Even excluding Khoa's March 15, 1995 statement to the police, the remaining evidence against Khoa was still strong. The evidence shows that Khoa played a key role in orchestrating and executing the May Tim Café shootings. Evidence was presented that Khoa participated in the killing of Truc, Le, and Vu. Khoa did not dispute his participation in those killings, his defense being merely that the killing of Truc was committed in the heat of passion, and was therefore voluntary manslaughter, and that, in the case of Le and Vu, he was guilty, at most, of involuntary manslaughter. The rejection of this defense by the jury was well justified, given the evidence of preparation and planning in the May Tim Café shootings, and the evidence of Khoa firing a shotgun into the small game room where the victims had crowded themselves.

*Khoa*, slip op. at \*30–\*31.

Petitioner argues that the state appellate court "misapplied the harmless error standard by asking solely whether the *untainted* evidence was sufficient to convict, rather than analyzing the extent to which the *tainted* evidence had an impact on the trial, as required by *Kotteakos v. U.S.*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)." Supplemental Brief at 1. More specifically, he argues that his taped confession had a substantial impact on the jury's verdict; and its admission "completely hamstrung the defense, [and] forced [petitioner's] counsel to concede petitioner's participation in the crime when he would not otherwise have done so." *Id.* at 2.

In his answer, respondent argues that "[e]ven if petitioner's statement had been

excluded, the remaining evidence overwhelmingly established that petitioner played a key role in planning and executing the May Tim Café shootings, and that he personally and intentionally fired the shotgun blast that killed Truc." Answer at 19. Respondent further argues that petitioner's manslaughter defense "would have been inherently implausible, even absent petitioner's statement, given the remaining evidence of the preparation and planning involved in the shootings and petitioner's act of firing a shotgun into the small game room in which three unarmed victims were crowded." *Id.*

### A. Legal standard

"The erroneous admission of statements taken in violation of a defendant's Fifth Amendment rights is subject to harmless error." *Ghent v. Woodford*, 279 F.3d 1121, 1131 (9th Cir.2002) (citing *Neder v. U.S.*, 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)); *see also Fulminante*, 499 U.S. at 303, 111 S.Ct. 1246 (admission of an "involuntary" confession at trial is subject to harmless error analysis). On direct appeal, "the standard for determining whether a conviction must be set aside because of federal constitutional error is whether the error 'was harmless beyond a reasonable doubt.'" *Brecht*, 507 U.S. at 622, 113 S.Ct. 1710 (citing *Chapman*, 386 U.S. at 24, 87 S.Ct. 824). On collateral review, the test is "whether the error 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710 (citing *Kotteakos*, 328 U.S. at 776, 66 S.Ct. 1239); *see also Bains*, 204 F.3d at 977 (the *Brecht* standard applies uniformly in all federal habeas corpus cases under section 2254).

■ Whether an error is harmless under either *Chapman* or *Brecht*, the reviewing judge should ask, "Do I, the judge, think that the error substantially influ-

enced .the jury's decision?" *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *Payton v. Woodford,* 346 F.3d 1204, 1216 (9th Cir. 2003); *see also Valerio v. Crawford,* 306 F.3d 742, 763–64 (9th Cir.2002) (error not harmless under *Brecht* where, if properly instructed, a single member of the jury could have come. to the conclusion, based on the evidence presented, that an aggravating circumstance did not exist). "A reviewing court does not examine whether there was sufficient evidence to support the conviction in the absence of constitutional error." *Ghent,* 279 F.3d at 1127; *see also Jeffries v. Blodgett,* 5 F.3d 1180, 1190 (9th Cir.1993) (emphasizing the *Kotteakos* Court's caution that "[t]he inquiry cannot be merely whether there was enough to support the result"). Instead, "the reviewing court must find that the error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." *Calderon v. Coleman,* 525 U.S. 141, 147, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998). However, "the way we phrase the governing standard is far less important than the quality of the judgment with which it is applied." *Brecht,* 507 U.S. at 642–43, 113 S.Ct. 1710 (Stevens, concurring). Where error is found, the state bears the burden of instilling in the court a "fair assurance" that it did not have a substantial and injurious effect on the jury's verdict. *See Payton,* 346 F.3d at 1217. "When a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." *O'Neal,* 513 U.S. at 445, 115 S.Ct. 992.

The Ninth Circuit has found that errors did *not* have a substantial and injurious effect or influence on the jury's verdict where the inadmissible evidence was not material to an essential element of the crime for which the defendant was convicted, *Pope v. Zenon,* 69 F.3d 1018, 1025 (9th Cir.1995) (as amended on January 4, 1996) (erroneous admission of initial brief confession was harmless where defense did not rely on a claim that he did not stab the victim); *Hardnett v. Marshall,* 25 F.3d 875, 881 (9th Cir.1994) (erroneous admission of inadmissible hearsay was harmless where the statements only went to prove premeditation and the jury convicted defendant of second degree murder, which did not require jury to find premeditation); where the inadmissible evidence was cumulative, *Pope,* 69 F.3d at 1025 (the record contained abundant persuasive evidence that the defendant stabbed the victim); *Laboa v. Calderon,* 224 F.3d 972, 977–78 (9th Cir.2000) (critical evidence was provided by testimony of another witness and the defendant's own admissible tape-recorded conversation, and evidence admitted in error "added nothing to the evidence against defendant").

The Ninth Circuit has found that errors did have a substantial and injurious effect or influence on a jury's verdict where the prosecutor emphasized the evidence, *see Ghent,* 279 F.3d at 1131 (prosecutor relied heavily on erroneously admitted psychiatrist's testimony during both opening and closing argument); *Coleman v. Calderon,* 210 F.3d 1047, 1051 (9th Cir.2000) (prosecutor's closing argument exacerbated the impact of erroneous instruction by emphasizing threat defendant posed to the public); *Henry v. Kernan,* 197 F.3d 1021, 1030 (9th Cir.1999) (prosecutor's use of erroneously admitted statement by defendant went to the root of prosecution burden to prove beyond a reasonable doubt that defendant acted with the intent required for a conviction of first or second degree murder); where the evidence established an element of the crime, *see Ghent,* 279 F.3d at 1131 (9th Cir.2002) (erroneously admitted psychiatrist's testimony was "critical" to proving premeditation); *Alvarez v. Gomez,* 185 F.3d 995, 999 (9th Cir.1999) (erroneously admitted statement by defen-

dant was the only evidence before the jury linking him to the predicate felony charged); *accord Parle v. Runnels*, 2002 WL 2012639, *19 (N.D.Cal. August 28, 2002) (erroneously admitted hearsay evidence was material to question of premeditation and deliberation); and where the erroneously admitted character evidence was "just the sort of evidence likely to have a strong impact on the minds of jurors," *McKinney v. Rees*, 993 F.2d 1378, 1386 (9th Cir.1993).

Other circuits have found that errors had a substantial and injurious effect or influence on the jury's verdict where an erroneously admitted statement established a motive for murder, *Lam v. Kelchner*, 304 F.3d 256, 270 (3rd Cir.2002); where the defendant was convicted almost exclusively on the basis of his inadmissable written confession, *Soffar v. Johnson*, 237 F.3d 411, 460 (5th Cir.2000); where most of the facts concerning the motive for murder and manner in which it occurred were derived solely from the inadmissable confession, *Arnett v. Lewis*, 870 F.Supp. 1514, 1543 (D.Ariz.1994); and where the inadmissable evidence played a significant role in the prosecution's argument, *see Brown v. Keane*, 355 F.3d 82, 92 (2d Cir.2004) (admission of 911 tape not harmless under either *Brecht* or *Chapman* where prosecutor explicitly argued in closing that the 911 tape corroborated officers' testimony that defendant fired his gun); *Goodwin v. Johnson*, 132 F.3d 162, 182 (5th Cir.1997) (possibility that jury focused solely on defendant's confessions was enhanced by prosecution statement in closing argument that confessions were the "only evidence" that the murder occurred in the course of a kidnaping); *Arnett*, 870 F.Supp. at 1543 (prosecution used confession to support some aspect of all three of its separate theories of how the crime was committed).

Although the Supreme Court held in *Fulminante* that the erroneous admission of confessions is subject to harmless error analysis, the Supreme Court, along with state supreme courts and lower federal courts, has recognized the substantial influence that a defendant's confession usually has on a jury's verdict. In *Rice v. Wood*, 77 F.3d 1138, 1142 (9th Cir.1996), the Ninth Circuit summarized *Fulminante* and explained the effects of the admission of a confession on defense strategy:

> All of the Justices in *Fulminante* agreed that a defendant's full confession is not just another piece of evidence; it is the one item that, alone, can form the basis of conviction by removing what otherwise would be a reasonable doubt. *Fulminante*, 499 U.S. at 296, 111 S.Ct. 1246 (White, J., opinion of the Court) ("A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.") (internal quotations omitted); *id.* at 312, 111 S.Ct. 1246 (Rehnquist, C.J., opinion of the Court) ("An involuntary confession may have a more dramatic effect on the course of a trial than do other trial errors—in particular cases it may be devastating to a defendant ..."); *id.* at 313, 111 S.Ct. 1246 (Kennedy, J., concurring) ("Apart, perhaps, from a videotape of the crime, one would have difficulty finding evidence more damaging to a criminal defendant's plea of innocence.").

Nor is the effect of a confession limited to the weight it might carry with the jury: Admission of a full confession immensely complicates the defendant's trial strategy; it puts pressure on him to give up the right to remain silent; it can foreclose alternative theories of the defense (such as an alibi) that are inconsistent with the confession. A wrongfully admitted confession also forces defendants to devote valuable trial resources neutralizing the confession or explaining

it to the jury, resources that could otherwise be used to create a reasonable doubt as to some other aspect of the prosecution's case. The devastating effect of a full confession on the defendant's case is not a matter of speculation—it is hard fact documented in many judicial opinions and discussed widely in law review articles.

*See also United States v. Garibay*, 143 F.3d 534, 540 (9th Cir.1998) (a defendant's inculpatory statement "is probably the most probative and damaging evidence that can be admitted against him") (quoting *Fulminante*, 499 U.S. at 296, 111 S.Ct. 1246); *Pope v. Zenon*, 69 F.3d at 1025 (as amended on January 4, 1996) ("a confession is like no other evidence"); *Henry*, 197 F.3d at 1030 (no other evidence of intent could have impressed the jury in the same way that defendant's own statements did, particularly because his confession was played in full for the jury); *U.S. v. Ince*, 21 F.3d 576, 583 (4th Cir.1994) (evidence of a confession can have a devastating and pervasive effect); *State v. McCloskey*, 90 N.J. 18, 31, 446 A.2d 1201 (N.J. 1982) ("Inculpatory remarks by a defendant have a tendency to resolve jurors' doubts about a defendant's guilt to his detriment"); *State v. Seibert*, 93 S.W.3d 700, 707 (Mo.2002) (because of the evidentiary strength of a confession and the contents of defendant's erroneously admitted statement, error was not harmless); *People v. Neal*, 31 Cal.4th 63, 86, 1 Cal.Rptr.3d 650, 72 P.3d 280 (Cal.2003) (although erroneous admission of a confession might be harmless in a particular case, it nevertheless is "likely to be prejudicial in many cases").

In *Alvarado v. Hickman*, 316 F.3d 841 (9th Cir.2002), the Ninth Circuit recently found that the admission of a statement of a 17–year old defendant who was interrogated without *Miranda* warnings "had a substantial and injurious effect on the jury's effect on the jury's verdict." *Id.* at 854–55. The court found that the admission of the statement was not harmless even though a witness testified: that defendant had been present when a co-defendant said "Let's jack," shortly before the two defendants approached a pick-up truck; that the defendants conversed with the driver and then there was a shot; that the witness and defendants then went to the witness's house, where the witness saw a gun; and that the witness and defendants then went to the park to hide the gun. *Id.* at 855. The Ninth Circuit found that, "although on direct examination [the witness's] account of the evening was fairly coherent, ... cross-examination ... exposed numerous inconsistencies and weaknesses." *Id.* The court pointed to (1) inconsistencies between the witness's earlier statements to police and his testimony, (2) that the witness had been smoking marijuana that night, (3) that the witness had been granted immunity, and (4) that the witness did not have any basis to believe that the defendant had known his co-defendant before that night. *Id.* The court explained,

> Without corroborating evidence, it might seem implausible that [defendant], who had no prior criminal record, would have agreed to commit a car jacking at gun point with someone he had met only a few hours earlier.
>
> . . .
>
> We believe that a witness ..., who has been drinking heavily, is plagued by a tricky memory and has been granted immunity with respect to the crime for which [the defendant] was prosecuted, is not powerfully credible.... There is, therefore, a high probability that [the defendant's] improperly admitted statements were the lynchpin of his conviction.

*Id.*

The state argued that since the defendant testified in his own defense, his un-

Mirandized statements were admissible. But, after reviewing the record, the court concluded that "there appears to be a strong possibility that [the defendant], if not confronted by his own statement ..., would not have testified in his own defense." *Id.* at 857. On this basis, the court found that "the self-incriminating statements clearly pass the *Brecht* test of having a substantial and injurious effect on the jury verdict." *Id.*

**B. Analysis**

For purposes of this habeas petition, the Court will assume that the proper inquiry is whether the state appellate court's harmless error finding was an objectively unreasonable application of the *Brecht–Kotteakos* test for harmless error. *See Esparza*, 540 U.S. at ——, 124 S.Ct. at 10; *Penry*, 532 U.S. at 795, 121 S.Ct. 1910; *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710. By so doing, this Court adopts the standard of review and interpretation of established federal law that are most deferential to the state court, and most favorable to the respondent. In conducting this review, the Court has examined the California Court of Appeal's application of the harmless error rule in the context of the whole trial and the jury's actual verdict. *See Brecht*, 507 U.S. at 642, 113 S.Ct. 1710 (Stevens, J., concurring) (stating that applying the *Kotteakos* standard properly requires review of the entire record in order to consider all the ways that error can infect the course of a trial).

■ After examining the role that petitioner's confession played at trial, including how the prosecution used it to prove material elements of its case and how its admission affected the defense's trial strategy, and considering the strength of the untainted evidence presented to the jury, this Court concludes that the California Court of Appeal's conclusion that the erroneous admission of petitioner's statement was harmless error is an objectively unreasonable application of the *Brecht–Kotteakos* rule.

The admission of petitioner's confession clearly infected the entire trial from start to finish. In his opening statement, the prosecutor told the jury that they would hear evidence that petitioner had admitted driving to the May Tim Café on the night of the murders, entering the café, and firing one round from a shotgun. Opening Statement at 441–42. Knowing the confession would be admitted, petitioner's attorney chose, in his opening statement, to read substantial segments of the confession to the jury. *Id.* at 456–61. Thus, before the jury heard a single witness testify, they already knew beyond a reasonable doubt—based on the admission of petitioner's statement—that he had participated in the murders. During the trial, the jury heard the tape of petitioner's statement, including his admissions that he was angry about Cuong's shooting, that he drove to the May Tim Café after hearing that the person responsible for Cuong's shooting was there, that he was the only person at the May Tim Café who had a shotgun, and that he fired that shotgun. Then, in his closing argument, the prosecutor told the jury that they would get a chance to listen to petitioner's tape during their deliberations—and he emphasized that they "will hear from [petitioner's] own words, his lack of remorse." Trial Tr. 1487. At the beginning of his closing rebuttal, after telling the jury that their job is not that difficult, the prosecutor declared, "This is a case where you have five people who ... have given you tape recorded statements of their role in murdering three people." *Id.* at 1769.

Thus, petitioner's statement was, by itself, unquestionably "the most probative and damaging evidence" that was admitted against him at trial. *See Garibay*, 143

F.3d at 540. As in *Soffar*, most of the facts concerning Khoa's motive for participating in the murders and the manner in which he participated in them were derived solely from his erroneously admitted statement. 237 F.3d at 460. Most crucially, if petitioner's statement had not been admitted, the jury would not have known that Cuong was like a brother to petitioner. They also would not have known that petitioner was the only person at the scene of the crime who had a shotgun—nor that he fired that shotgun inside the May Tim Café. For these reasons, it defies common sense to conclude that the admission of petitioner's statement did not have "a substantial and injurious effect on the jury's verdict." *See Brecht*, 507 U.S. at 637, 113 S.Ct. 1710.

Despite its holding, there is nothing in the California Court of Appeal's extremely brief analysis of harmless error that suggests that the state appellate court found that the admission of petitioner's statement did not substantially affect the jury's actual verdict. Instead of asking that question, the state appellate court focused only on whether the "remaining evidence" was strong. *Khoa*, slip op. at *31. In so doing, the state appellate court incorrectly applied the harmless error test. *See Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239 (the inquiry cannot be merely whether there was enough evidence to support the result); *O'Neal*, 513 U.S. at 438, 115 S.Ct. 992 (quoting *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239); *see also Chapman*, 386 U.S. at 24, 87 S.Ct. 824 (stating the harmless error rule in the alternative as either "whether there is a reasonable possibility that *the evidence complained of* might have contributed to the conviction" or "requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that *the error complained of* did not contribute to the verdict obtained") (emphasis added); *Hanna v. Riveland*, 87 F.3d 1034, 1039 (9th Cir.1996) (in applying the harmless

error standard, a court "must determine, not whether there was substantial evidence to convict [the petitioner], but whether [the error] had a substantial influence on the conviction").

Although the state appellate court's application of the harmless error rule was clearly an incorrect application of both *Kotteakos–Brecht* and *Chapman*, the result of its analysis would not have been objectively unreasonable if the untainted evidence of guilt presented at trial had been so overwhelming or persuasive that petitioner's statement was merely cumulative. *See Morales v. Woodford*, 336 F.3d 1136, 1149 (9th Cir.2003) (finding a constitutional error harmless where admissible evidence was overwhelming); *Pope*, 69 F.3d at 1025 (finding a constitutional error harmless where record contained abundant persuasive evidence); *Laboa*, 224 F.3d at 977–78 (finding a constitutional error harmless where evidence admitted in error "added nothing to the evidence against defendant"). In this case, however, the untainted evidence was far from overwhelming.

A video tape of a crime can provide just the kind of overwhelming evidence that would cause the erroneous admission of a confession to be a harmless error. *See Fulminante*, 499 U.S. at 313, 111 S.Ct. 1246 (Kennedy, J., concurring) (suggesting that a videotape of the crime could be more damaging to a criminal defendant's plea of innocence than a confession); *Neal*, 31 Cal.4th at 86, 1 Cal.Rptr.3d 650, 72 P.3d 280 (erroneous admission of a confession would be harmless where there is a videotape of the commission of the crime). In this case, however, the trial record suggests that the security camera video tapes provided less than conclusive evidence of petitioner's guilt. Most crucially, in his opening statement, the prosecutor explicitly told the jury that Ho was the only one

of the defendants who they were likely to be able to identify on the video tapes. Opening Statement at 419. It is thus unsurprising that the state appellate court did not specifically mention the video tapes in its harmless error analysis. *Khoa,* slip op. at *31. Moreover, in his answer, respondent also failed, in arguing that the error was harmless, to discuss the video tapes. Answer at 19–20. At oral argument, when the Court asked about the video tapes, counsel for respondent admitted that he had not viewed them and that the respondent was not relying on the tapes to meet his burden of providing the reviewing court with a "fair assurance" that the error was harmless. *See Payton,* 346 F.3d at 1217. Given the prosecutor's warnings about the terrible quality of the video tapes, the lack of any evidence that the state appellate court based its harmless error finding on the strength of the evidence provided by the video tapes, and respondent's failure to argue that the video tapes provided substantial, independent support for the jury's verdict, this Court has no basis upon which to find that the video tape evidence provided an objectively reasonable basis to find that the erroneous admission of petitioner's statement was harmless error.

The other purportedly untainted evidence of petitioner's guilt consisted of the pretrial statements and testimony of Dang, Long, Nam and Linh. In its opinion, the state appellate court did not specifically discuss the probable effect of the testimony of any of these witnesses on the jury's verdict. *Khoa,* slip op. at *31. As discussed above, at trial, two of these witnesses testified under immunity, all of them admitted to being heavily intoxicated and/or under the influence of drugs on the night of the murders, and, except for Dang, either denied, or did not recall, making the pretrial statements that the prosecution relied on to prove material elements of his case. These are the same kinds of

concerns that the Ninth Circuit pointed to in *Alvarado* when it held that an eyewitness's testimony was not sufficient to render the erroneous admission of a confession harmless. *Alvarado,* 316 F.3d at 854–55. In this case, however, the prosecutor's own statements invited the jury to doubt the credibility of these witnesses.

In his opening statement, the prosecutor warned the jury that his witnesses would include "criminals, drug users, liars and drunks." Opening Statement at 413. He acknowledged that some of them had been given immunity, and that the jury "should consider that as affecting their credibility, how believable they are." *Id.* He told the jury that Long would verify that people at petitioner's house spoke about getting the guy who shot Cuong, but he acknowledged that Long "can't say which particular defendant, which particular words." *Id.* at 422. In his closing argument, the prosecutor told the jury:

> Obviously, these are people [Long, Linh, Nam, Dang] who have done criminal things and should be looked at with caution by you. They have also given inconsistent statements. I think a number of people came into court and lied to you, certainly lied and said I don't recall, things like that, whether that was Cuong Do lying to you about things he couldn't remember having admitted to the officer, or Nam Duong apparently is brain dead if you look at his testimony here.

Trial Tr. at 1451.

In analyzing the independent effect of the testimony of these four witnesses on the jury's verdict, the Court notes two things. First, even if the jury agreed that the statements and testimony of these witnesses proved exactly what the prosecution said they proved, it would not have proven all of the material elements of the prosecution's case in chief. None of these four witnesses said they saw the defendant

fire the shotgun, or even enter the May Tim Café with a shotgun; and only Nam provided any support for the prosecution's theory that petitioner participated in planning the murders. More importantly, in his closing argument, the prosecutor urged the jury to use the other evidence that they had heard during the trial to resolve the inconsistencies in the witnesses' statements and testimony. He suggested that, "just like a jigsaw puzzle where you take one statement by one witness or one photograph, you cannot tell whether that belongs, whether it's truthful or not, but like a puzzle, if you compare it, corroborate it to the other surrounding evidence that you do know is true and you have all these pieces that are consistent and you know belongs, you can find out where it belongs in the puzzle." *Id.* at 1449–50. Then, he told the jury, that they would "see that certain of [the witnesses] statements are truthful because they do fit with the big picture, with the evidence, *evidence that even individual defendants have admitted.*" *Id.* at 1450 (emphasis added).

The prosecutor's closing explanation of the evidence that petitioner participated in a conspiracy to get the guy who shot Cuong provides a clear example of the way in which the admission of petitioner's statement infected the jury's consideration of the testimony of prosecution witnesses. After declaring that there are three witnesses who describe the conspiracy that began at Khoa's house, the prosecutor reminded the jury that, "Khoa himself admits his own involvement being in the house and seeing his friends came [sic.] over and talk about Cuong Do's shooting." Trial Tr. at 1471. In this way, the prosecution used petitioner's erroneously admitted statement to corroborate the otherwise shaky testimony of his key witnesses. It is, therefore, impossible for this Court to conclude that the statements and testimony of those witnesses provided an objectively reasonable basis for the state appellate court to determine that the admission of petitioner's statement did not have a substantial and injurious effect on the jury's actual verdict.

■ Finally, in finding harmless error, the California Court of Appeal relied heavily on the fact that, at trial, petitioner did not dispute his participation in the killings, but instead argued that he acted in the heat of passion and, therefore, was guilty only of manslaughter. *Khoa,* slip op. at *31. This was an objectively unreasonable application of the harmless error rule. As the Ninth Circuit held in *Alvarado,* when a defendant decides to testify because a trial court rules that a prior self-incriminating statement is admissible, his subsequent testimony cannot be used on appeal to prove that the erroneous admission of his prior statement did not have a substantial and injurious effect on the jury's verdict. 316 F.3d at 855; *see also Smith v. Estelle,* 527 F.2d 430, 433 (5th Cir.1976) ("If [a defendant] would not have taken the stand but for the admission of his unlawful pre-trial confession, ... then his trial testimony was tainted thereby and cannot be considered as independent evidence of guilt for purposes of applying the harmless error rule."); *cf. Hart v. Attorney Gen. of State of Florida,* 323 F.3d 884, 896 (11th Cir.2003) (the fact that psychologist's testimony would have been unnecessary if the prosecution had not been allowed to present unlawfully obtained statement is further evidence that the admission of the statement was not harmless error).

For the reasons stated above, this Court concludes that the California Court of Appeal's application of the *Brecht–Kotteakos* harmless error rule was an objectively unreasonable application of clearly established federal law. *See Esparza,* 540 U.S. at ——, 124 S.Ct. at 10; *Penry,* 532 U.S.

at 795, 121 S.Ct. 1910; *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710.

### III. Gang Evidence Claim

Petitioner claims that the admission of gang evidence "severely prejudiced" his trial. Respondent argues that the claim should be denied because the gang affiliation evidence was properly admitted as evidence of motive against Ho (who was a member of AB) and Sunny (who was not a member but admitted he had friends in AB); and that because the defendants were tried as co-conspirators and aiders and abettors as well as direct perpetrators, evidence of motive as to any defendant was relevant as to all defendants, including petitioner. Answer at 25. Alternatively, respondent argues that the admission of the gang evidence was harmless error because (1) the prosecutor admitted that petitioner was not a gang member; (2) the jury was instructed not to draw impermissible inferences from the gang affiliation evidence; (3) the fact that Son was only convicted of second degree murder and the jury was unable to reach a verdict as to Khanh indicated that the jury carefully weighed the evidence; and (4) the remaining evidence overwhelmingly established petitioner's guilt. *Id.*

### A. Legal standard

 The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry,* 197 F.3d at 1031. Admission of evidence violates due process only when two circumstances are met: (1) "there are *no* permissible inferences the jury may draw from the evidence" and (2) the evidence is "of such quality as necessarily prevents a fair trial." *Jammal v. Van de Kamp,* 926 F.2d 918, 920 (9th Cir.1991) (quotations and citation omitted). Moreover, juries are presumed to follow a court's limiting instructions with respect to the purposes for which evidence is admitted. *See Aguilar v. Alexander,* 125 F.3d 815, 820 (9th Cir.1997).

### B. Analysis

At trial, petitioner and his co-defendants moved to exclude gang affiliation evidence on the grounds that it was irrelevant, improper character evidence, and unduly prejudicial. The trial court denied these motions. On direct appeal to the California Court of Appeal, petitioner and his co-defendants argued that the gang evidence was irrelevant because the identity of the shooters was not disputed and the shootings were not gang-related. In support, they argued (1) there was no evidence that the group who met at Khoa's house shared any gang association; and (2) there was no evidence the defendants who went to the May Tim Café discussed seeking revenge against a rival gang. Appellant's Opening Brief, *People v. Ho Thai Nguyen,* No. H019770, Cal. Ct.App., 6th District, February 23, 2000 at 20–21. Petitioner argued separately that the admission of the gang evidence was particularly prejudicial in his case because the prosecutor's suggestion that the group had an indiscriminate gang motive undercut his voluntary manslaughter defense.

The state appellate court rejected the defendants' claim as to the gang evidence. *Khoa,* slip op. at *20. The court explained:

> Here, the theory of the prosecution was that defendants and some others in the group that went to the May Tim Café conspired to commit first degree murders charged in this case, and did commit, or aid and abet the commission of, those murders because they believed that [Cuong] Do, who was a leader, or used to be a leader, of the AB gang, was

shot by a member of the rival AKA gang. The fact that this belief later turned out to be mistaken because Do's shooter was not in fact a member of the AKA gang did not change the fact that when defendants went to the May Tim Café to commit the murders, their motive was gang-related; i.e. to avenge the shooting of their leader, or former leader. Because defendants were tried as co-conspirators and aiders and abettors, as well as direct perpetrator's, evidence that one or more of them had a gang-related motive or intent in committing the murders was relevant and probative not only to the defendant who harbored the gang-related motive or intent, but also to all the other defendants in the conspiracy.

Given the prosecution's theory of the case, evidence that defendants were gang members, or were affiliated with gangs, was relevant, and the trial court's conclusion that the gang-affiliated evidence was not outweighed by its potential for prejudice was not an abuse of discretion. It did not exceed the bounds of reason.

*Id.* at *21–*22.

■■■■ In his petition, petitioner suggests, based on California case law, that the gang evidence should not have been admitted because it was not relevant, its prejudicial impact outweighed its probative value, and it was not presented by competent witnesses. But the possibility that a state court's evidentiary rulings misapplied state law is not subject to federal habeas review. *See Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Jammal,* 926 F.2d at 919–20. Petitioner provides no specific federal grounds for finding that the gang evidence was inadmissible.

In any event, as the California Court of Appeal found, it was not unreasonable for the trial judge to conclude, as to those defendants who were gang members, that the gang affiliation evidence was material to establishing motive; and that, if the evidence was admissible as to one defendant, it was admissible as to the others who were accused of aiding and abetting him. *Khoa,* slip op. at *21–*22. Thus, petitioner fails to carry his burden on collateral appeal to establish that there were *no* permissible inferences that a jury could draw from the gang evidence.

Petitioner also fails to establish that the admission of the gang evidence necessarily denied him a fair trial. In his closing, the prosecutor specifically acknowledged that defendant was not a gang member, Trial Tr. at 1455–56, 1793. Moreover, the trial judge instructed the jury as follows:

Evidence has been introduced that certain defendants or other persons is or was a member of a particular gang [sic]. Such evidence, if believed was not received and need not be considered by you to establish that such a defendant or other person is a person of bad character or that he has a disposition to commit crimes.

Such evidence was received and may be considered by you only for the limited purpose of determining whether it tends to show the motive of the person who committed the crimes, if any, of which the defendants are accused or the existence or nonexistence of a bias or interest of any witness. For the limited purpose for which you may consider such evidence you may weigh it in the same manner as you do all other evidence in this case. You are not permitted to consider such evidence for any other purpose.

*Id.* at 1411–12. This Court must presume that the jury followed the court's limiting instructions with respect to the purposes for which evidence is admitted. *See Aguilar,* 125 F.3d at 820. The Court, there-

fore, has no basis to find that, in petitioner's case, the jury reached its verdict based on impermissible inferences from the evidence that other defendants and witnesses were gang members. For these reasons, this Court finds that California Court of Appeal's determination concerning the admissibility of the gang evidence was not contrary to, or an unreasonable application of, clearly established Federal law. *See Andrade,* 538 U.S. at 75, 123 S.Ct. 1166; *Williams,* 529 U.S. at 409, 120 S.Ct. 1495.

## CONCLUSION

For the reasons stated above, the Court concludes that the state appellate court's determination that the improper admission of petitioner's confession was harmless error was an objectively unreasonable application of clearly established federal law. *See Esparza,* 540 U.S. at ——, 124 S.Ct. at 10; *Penry,* 532 U.S. at 795, 121 S.Ct. 1910; *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710. Accordingly, Khoa Dang Nguyen's petition for writ of habeas corpus is GRANTED. The conviction and sentence of petitioner for violations of California Penal Code Section 187 (First Degree Murder) are vacated and set aside. The State of California shall determine whether petitioner is to be retried on these charges within sixty (60) days of this order.

**IT IS SO ORDERED.**