Filed 10/12/21  P. v. Custer CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C089875 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE020057) |
| v. | |
| JUSTIN DEWAIN CUSTER, | |
| Defendant and Appellant. | |

Rejecting theories of self-defense and defense of others, a jury convicted defendant Justin Dewain Custer of attempted murder, discharging a firearm at an occupied motor vehicle, shooting a firearm in a grossly negligent manner, and assault with a semiautomatic firearm. The jury further found that defendant personally used a firearm, personally used and intentionally discharged a firearm, and personally used and intentionally discharged a firearm causing great bodily injury. The trial court sentenced defendant to an aggregate term of 32 years to life in state prison.

1

Defendant now contends (1) the trial court abused its discretion and violated due process principles by limiting his ability to present evidence of the victim's acts of violence; (2) trial counsel was ineffective when failing to request the jury be instructed that it could consider the victim's reputation and character for violence; (3) the trial court violated defendant's constitutional rights when it instructed the jury with CALCRIM No. 3472 (Right to Self-Defense:  May Not Be Contrived), as the instruction was "not relevant given the facts presented at trial" and "reduced the prosecution's burden of proof"; (4) trial counsel was ineffective by presenting a closing argument that was "almost entirely premised on a factual error"; and (5) remand is necessary to allow the trial court to consider imposing a lesser firearm enhancement in lieu of the enhancement imposed for personally and intentionally discharging a firearm causing great bodily injury.

We will affirm.

## BACKGROUND

In April 2017, defendant and Manuel Anthony Penna had been close friends for several years, and defendant knew Penna as a family friend of more than 20 years.  The two socialized often, and worked on cars together, sometimes at defendant's home.

Defendant's home was on Lerwick Road, though at the time of the shooting, defendant was staying with his friend and neighbor, Dustin Brown, on Lerwick Road. Penna often stayed at his mother's house also on Lerwick Road, about 11 houses away.

In early April 2017, Penna traded a firearm for Brown's car, a Mustang.  Penna remarked to Brown that he felt "naked" without the gun he traded, and Brown replied that he would give Penna the chance to buy the "next gun" that Brown obtained.

Later, defendant showed a .40-caliber Smith & Wesson gun to Penna, who expressed interest in it.  But because Penna didn't have enough money to buy the gun directly from Brown, Brown and defendant "worked it out" so that defendant obtained

2

the gun from Brown, and then gave it to Penna in exchange for $200 and various items, including a signed San Francisco 49ers football.

Four or five days later, Penna learned that defendant "need[ed] the gun back." Penna "got upset at" defendant.

*People*'s *Case*

i. *Penna's Testimony*

Penna testified that on the day of the shooting, about a week after learning that defendant wanted the gun back, Penna was in his mother's garage playing videogames with a friend when defendant "pull[ed] up in his wife's . . . Corolla," walked into the garage, and said that he could see "all the way down to" Penna's mother's house with a "new scope for [a] rifle" that defendant recently acquired.  Penna replied:  "What the fuck are you talking about, dude, you can see all the way down?"  "What are you staring at my house with a scope for?"

Defendant responded:  "No, no, no.  It's nothing like that.  I just want you to know, if you had a problem down there, I got your back."  Defendant then inquired about the gun Penna obtained from him, and Penna replied:  "I'm not trading back with you."  "[A] deal is a deal."

Defendant got mad and said, "Remember what I said about that scope."  Penna replied:  "Motherfucker, you come down to my mom's house and threaten me at my mom's house?"  Defendant "took off running to his car, [and] [Penna] took off chasing him."  Defendant got in his car, and Penna tried to open the door.  Defendant "turn[ed] the wheel to where the car hit[] [Penna] . . . [¶] . . . and . . . stop[ped] on [Penna's] foot."  Penna twice told defendant that the car was on his foot, but defendant "didn't move the car, so [Penna] . . . knocked the glass out" of the driver's side front window with his hand.  Defendant drove away down the street "about two or three cars, turn[ed] around," and "pull[ed] [a] gun" out, "just point[ing] and look[ing] at" Penna, and left.

3

Penna changed his clothes and agreed with his friend they should leave his mother's house. Penna's friend left in her own car, as she had "things that she was going to do," and Penna was "probably . . . just going to go for a ride and smoke a cigarette." As Penna drove by defendant's home in his Mustang (which Penna explained was "loud" because the "exhaust [was] cut off"), he saw defendant's wife outside with a broom and dustpan and felt bad that he broke her car window. He also saw defendant.

When Penna heard "the first pop," he thought it came from his car. But then he heard "pop, pop, pop, pop, pop . . ." and realized that someone was shooting at him. He did not see defendant shoot at him or hear defendant say anything. He looked in the rearview mirror, and saw a bullet in his face.

Penna said he did not possess a gun at the time of the shooting.

Penna admitted that he suffered felony convictions in 1999, 2003, 2006, and 2009. On cross-examination, he admitted (i) his 1999 conviction was for assault with a deadly weapon, and that he went to prison for the offense, and (ii) his 2006 and 2009 convictions were for being an "ex-felon with a gun."

Also on cross-examination, Penna denied ever assaulting defendant's wife.

ii. *Eyewitness Testimony*

Moments before defendant fired his gun at Penna, a man who lived across the street, got in his truck to get gas. The truck was in a driveway and facing the street. The man described to the jury what he saw through his windshield: "I saw the guy in front of me, he was kind of like kind of waiting for the car -- for a car to get there, to pass. He was kind of waiting for the car to pass. Like, he was following with his hand, following with his hand to the car."

Under further questioning, the man explained that when he said defendant was "following the car with his hands," he meant "shooting at the car." The car defendant was shooting at was moving from the man's right to his left, as he sat in his truck.

4

### iii. *Video Evidence*

The shooting was captured on video cameras mounted next door to the testifying eyewitness's home. The videos show a duplex, with two cars parked in the driveway. The garage door on the right is closed, and the garage door on the left (corresponding to Brown's home) is half-open. Penna's friend's car drives past the duplex at 19:33:07, and defendant emerges from Brown's garage seven seconds later, stands by the garage door for about five seconds, and then goes back inside at 19:33:19. At 19:33:30, defendant emerges from the garage for the second time, and crouches/kneels between the garage door and a parked car. At 19:33:36, defendant stands up and begins firing his gun at Penna's car as it drives by, firing the last shot at 19:33:39.

### Defendant's Case

### i. *Defendant's Testimony*

Taking the stand in his own defense, defendant testified that his relationship with Penna took a negative turn when, beginning about two weeks before the shooting, Penna's girlfriend came to defendant's home with "black[] . . . eyes" and a broken nose inflicted by Penna, and a short time later, Penna struck defendant's wife (and mother of his two children) with a pistol, "completely split[ting] in half" one of her lips, and threatened to kill her.

Penna assaulted defendant's wife when she confronted Penna about his inoperable car that had been parked in front of defendant's home for "months," generating several "code-enforcement complaints that went to [defendant's] landlord" and "came back to" defendant. Defendant's wife declined to seek medical attention for her injuries, because "it would [have] put [them] in more danger" with Penna, but she asked defendant: "What else has to happen . . . for you to do something?" Defendant began to fear Penna.

On the day of the shooting, defendant went to Penna's mother's house and knocked on the garage door, which was slightly open, and asked Penna to come outside to talk about the car in defendant's driveway. Defendant wanted to "get the car moved

5

because [he] had a three-day notice that if the car wasn't . . . moved, [his family] would be evicted." At first, Penna ignored defendant and continued playing video games. But then Penna "grabbed his gun from out of the couch and stuck it in his waist[band]," which surprised defendant, who "didn't think that [Penna] was going to react with a firearm to that situation."

Defendant "told [Penna] about the car, [but] [Penna] just assumed it was about [the] firearm" that defendant traded with Penna. Defendant told Penna that he "needed the car moved, that [he] wasn't down there for [the] firearm," which Penna "could . . . shove . . . up his ass." Defendant complained that Penna was "causing problems for [him] and [his] wife and [his] family."

Penna "pull[ed] his gun out of his waist[band], and he sa[id], Well, what do you mean? You going to snitch on me now?" Defendant understood Penna to be referring to the assault on defendant's wife. As he walked backwards toward his car, defendant repeated that he "need[ed] [Penna] to get [his] stuff . . . away from [defendant's] house." "Just stay away from me," defendant said.

Penna approached the car as defendant got in, and asked defendant if he was going to call the police. Defendant closed the door and started the car. Penna unsuccessfully tried to open a locked car door, "smash[ed] out" the car window with his gun ("put[ting] a little gash on the side of" defendant's head), and "put the gun to [defendant's] head." Penna tried to pull defendant out of the car, and said: "You know who I am, and you know what we do to rats," referring to "people that talk to cops," defendant explained. Penna told defendant he would "kill [him] in front of [his] wife and [his] kids," "chambered a round," and said to defendant: "If you were smart, you would go down there and say good-bye to your kids right now." Defendant drove home and, as he retrieved a gun, told his wife to leave with their children, because Penna was coming to kill him. Defendant "had a pretty good idea [Penna] was coming down the street," given what Penna had just told him. When defendant's wife remarked that she couldn't put

their two-year-old in the child's car seat, because there was broken glass in it, defendant said he would ask Brown for keys to another car and a cell phone, so that his wife could call the police after she left.

Defendant "ducked into [Brown's] garage, and was waiting there," for Brown to get the car keys and phone when he saw Penna's friend's car "coming down the street." "[J]ust as" the car passed Brown's home, it double-parked "on the side of the road" and "waited for [Penna] to come down the street, which [was] how [defendant] knew [Penna] was going to be coming . . . ." Defendant's children were "out front," with his wife, who was trying to "clean the glass up real quick."

As Penna's car approached, defendant saw his wife push his son to the ground, where his daughter was sitting in a car seat. Defendant "st[ood] up out of the garage. And [Penna] [was] pointing a gun outside his passenger window." The gun rested on the partially open window, as Penna held it with his right hand. Seeing that, defendant tried to shoot the gun out of Penna's hand, as he "didn't want [Penna] to shoot towards [him] and [his] family." Defendant fired his gun "until [he] didn't see [Penna's] gun anymore." Defendant shot at Penna because he was afraid.

ii. *Cross-examination*

On cross-examination, defendant denied he had a gun when he visited Penna on the day of the shooting, and agreed that the video footage shown earlier in the trial showed him shooting at Penna from Brown's driveway, and the moments just before the shooting.

Defendant explained that, while he was in Brown's garage waiting for car keys and the cell phone to give to his wife, a neighbor's daughter "walked into the garage," looking for her father. And though defendant initially "went to run and hide in the garage" after he saw Penna's friend's car "drive by and stop and wait for" Penna, the appearance of the neighbor's daughter prompted him to "step[] out of the garage to try to

7

take whatever potential gunfire or whatever was going to happen, and keep it away from her."

The following exchange occurred:

"[The prosecutor]: Now, we then see you come back outside the garage, right, and crouch down low?

"[Defendant]: I don't think I came outside and crouched down low, no. I just came out of the garage, from my recollection.

"[The prosecutor]: So that surveillance footage doesn't show you coming out of the garage and ducking down underneath what would be the hood of [a car parked in the driveway]?"

"[Defendant]: I guess the video depicts what it depicts, but I came out of the garage. I wasn't crouched down. When I came out of the garage, I knew he was there with a gun."

Defendant conceded that, though he spoke to police about the shooting, his trial testimony was the first time he presented this version of events. He admitted that he lied to the police when he said he didn't know Penna and wasn't on Lerwick Road in April 2017. He said he lied "[o]ut of fear for [his] family."

iii. *Defendant's Wife's Testimony*

Defendant's wife testified that some time before the shooting -- when she went to Penna's house to talk to him about the problems between Penna and defendant -- Penna ran at her with a pistol and hit her in the face with it.

When defendant came back from Penna's house on the day of the shooting, his head was bleeding, and the car window was broken, with glass inside. Defendant told his wife that if she heard Penna coming down the street, to make sure the kids were inside. She was cleaning glass out of the car when she saw Penna coming in his car, holding a pistol in his hand. At that moment, her son came into the front yard, and she looked at

8

defendant to warn him. She saw defendant shoot at Penna's car, and she felt defendant "did what he had to do to protect [their] kids."

*Jury Instructions*

The trial court instructed the jury on self-defense, imperfect self-defense, and "heat of passion" attempted voluntary manslaughter as a lesser included offense of attempted murder. The trial court also instructed the jury with CALCRIM No. 3472, explaining that "[a] person does not have the right to self-defense or defense of another if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

*Closing Arguments*

In closing argument to the jury, the prosecutor argued defendant's version of the shooting was "utterly unreasonable on its face. You almost don't have to look at the other evidence . . . . It just doesn't pass the sniff test, right?"

The prosecutor homed in on the video evidence: "How long was [defendant] hunkered down there? How long is he squatting down there while . . . Penna is apparently pointing a gun at his wife? That behavior, that body language, just utterly does not comport with the story he is trying to spin for you in court." The prosecutor argued that defendant's self-defense/defense-of-others theory "[u]tterly d[id] not work," because after the altercation at Penna's mother's house, defendant went home, and "[t]he entire thing cool[ed] off. Then he ambushed him. [¶] That's what we see [in the video.]" "This [was] not self-defense. This was an ambush," the prosecutor repeated, after playing video footage for the jury.

Defense counsel argued defendant acted in defense of himself and defense of others when he shot at Penna.

He contended that a Smith & Wesson bullet found on the ground at Penna's mother's house buttressed defendant's testimony that Penna broke defendant's car window with a gun, not his hand. The prosecutor objected that this was not a fact in evidence, and the trial court sustained the objection.

9

In rebuttal argument, the prosecutor referenced defense counsel's factual error about the bullet found near Penna's mother's home, and suggested defense counsel was "making up facts" because he was "out of ways to convince [the] jury of self-defense." The prosecutor argued that if Penna actually had a gun in his car at the time of the shooting, he "would have admitted it."

*Verdicts and Sentence*

On May 21, 2019, a jury found defendant guilty of attempted murder (§§ 664/187, subd. (a)), discharge of a firearm at an occupied vehicle (§ 246), assault with a firearm (§ 245, subd. (b)), and shooting a firearm in a grossly negligent manner (§ 246.3). Further, the jury found that defendant personally used and personally discharged a firearm, causing great bodily injury to Penna (§§ 12022.5, subds. (a), (d), 12022.53, subds. (b), (c), (d), 12022.7, subd. (a)).

The trial court imposed a sentence of seven years in prison for the attempted murder (the middle term), plus an indeterminate term of 25 years to life in prison for the associated firearm enhancement (§ 12022.53, subd. (d)). The trial court imposed and stayed sentences for defendant's three other offenses, pursuant to section 654.

At the sentencing hearing, the trial court addressed defendant about why he did not accept the prosecution's offer to resolve the case before trial: "I don't know what you were thinking, because you are on videotape shooting this guy. You are on videotape. It was a virtually unlosable case. [¶] . . . No jury in their right mind would do anything but convict you of this crime. [¶] . . . [¶] [Y]ou very furtively -- it's very obvious. You wait. You can hear the car coming. You can hear it accelerating as it comes by your home, and you run out there and ambush him. [¶] When they watched that videotape, I turned and looked at the jury. As soon as they saw that videotape it was over. . . . Because everybody knows that you don't run out from behind a car and start shooting somebody else, and . . . get to . . . argue self-defense."

10

## DISCUSSION

### I

*Claims for Reversal of the Convictions*

Defendant presents four claims for reversal of his convictions: (1) the trial court abused its discretion and violated defendant's due process rights to a fair trial by limiting his ability to present evidence of Penna's acts of violence both prior and subsequent to the shooting; (2) trial counsel's failure to request the jury be instructed that it could consider Penna's reputation and character for violence deprived defendant of effective assistance of counsel; (3) the trial court violated defendant's constitutional rights to a fair trial and due process when it instructed the jury with CALCRIM No. 3472, as the instruction was "not relevant given the facts presented at trial" and "reduced the prosecution's burden of proof"; and (4) trial counsel rendered ineffective assistance by presenting a closing argument that was "almost entirely premised on a factual error."

Defendant acknowledges that each of these claims is subject to review for harmless error.

Because we conclude that any error by the trial court and/or trial counsel was harmless, we reject defendant's claims.

A. *Ruling on the Admissibility of Penna's Violent Acts and Violent Character*

Prior to trial, the People moved to exclude any evidence tending to show Penna's violent character, arguing that such evidence was only relevant if defendant raised a claim of self-defense. Defense counsel argued that defendant would argue self-defense and would testify, and therefore that Penna's propensity for violence was an issue for the jury to consider.

The trial court told defense counsel that evidence of Penna's violent acts was relevant only if defendant was aware of the acts, and that counsel could not introduce *details* of Penna's then-recent criminal convictions for assault with a deadly weapon and

11

mayhem,[1] as Penna's commission of those crimes (which Penna committed *after* the shooting) was admissible only to impeach Penna, not to demonstrate Penna's violent character.

Defendant argues the trial court's ruling was wrong in at least two ways: (1) the trial court should have allowed defendant to introduce evidence of Penna's violent acts to prove that Penna "acted in conformity with his violent character on the day of the shooting"; and (2) Penna's *post*shooting character evidence was also admissible. Acknowledging that trial counsel "failed to press the issue," defendant contends that any possible forfeiture of this claim was ineffective assistance of counsel, which would permit us to consider the merits.

The People argue defendant forfeited this claim by failing to make "specific objections in the trial court," and, on the merits, the trial court did not abuse its discretion, but "ruled . . . in a practical manner that allowed [defendant] to present the relevant evidence he actually wanted to present." Last, the People argue any error was harmless.

B. *Counsel's Failure to Request Jury Instructions on Penna's Violent Character*

Defendant argues that trial counsel "did not request that the jury be instructed that it could consider Penna's reputation and character for violence and aggression, or his specific acts of violence and aggression, as substantive proof of [Penna's] actions on the day of the shooting," and that this failure deprived defendant of effective assistance of counsel.

The People argue defense counsel "had conceivable, rational reasons for not" requesting those instructions, and in any event defendant was not prejudiced by counsel's performance, because "the evidence of [defendant's] guilt was quite compelling."

---

[1] The mayhem conviction apparently concerned Penna biting someone's finger off.

C.  *CALCRIM No. 3472*

Defendant argues there was no substantial evidence that he provoked a fight with the intent to create an excuse to use force, and that, even if there were such evidence, the instruction is an incorrect statement of law that lessened the prosecution's burden of proof.  Acknowledging that trial counsel did not object, defendant argues we can consider this claim because (i) the trial court's error affected his substantial rights, and/or (ii) trial counsel's failure to object was ineffective assistance.

The People argue defendant forfeited this claim by failing to raise it below and that even if the claim is not forfeited, we need not analyze the merits, because any error was harmless.

D.  *Defense Counsel's Closing Argument*

Defendant argues that "[t]he entire" defense closing argument "was premised on . . . a factual error" -- "that the bullet found on the ground in front of Penna's mother's house was a Smith and Wesson bullet" -- which the prosecution "pounced on . . . and presented . . . as . . . a blatant and deliberate lie."  Thus, defendant maintains, "by digging in to an easily disprovable misstatement of the testimony," defense counsel "squandered [the] last clear chance" to persuade the jury that there was reasonable doubt.

The People argue that even if trial counsel's factually unsupported argument was deficient performance, defendant cannot show prejudice, in part because defense counsel's closing argument was *not* -- as defendant argues -- " 'premised on th[at] factual error.' "  Further, "the evidence against [defendant] was quite compelling."

E.  *Harmless Error*

"If an error violates a defendant's federal constitutional rights, reversal is required unless the error was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*).)  If the error is one of state law, we must reverse the conviction if it is reasonably probable the defendant would have obtained a

13

more favorable result absent the error.  ([*People v.*] *Watson* [(1956)] 46 Cal.2d [818,] 837.)"  (*People v. Hernandez* (2011) 51 Cal. 4th 733, 745.)

Under *Chapman*, "we ask 'whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error.' "  (*People v. Canizales* (2019) 7 Cal.5th 591, 615.)  Under *Watson*, we ask " 'what a reasonable jury . . . is likely to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' "  (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

" 'The harmless-error doctrine . . . "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial." ' "  (*People v. Concha* (2010) 182 Cal.App.4th 1072, 1087.)

Video footage of a defendant committing the crime, if seen by the jury, may be so compelling that even significant trial errors -- such as the erroneous admission of a confession -- might be found harmless beyond a reasonable doubt on appeal.  (See *People v. Neal* (2003) 31 Cal.4th 63, 86 [explaining that "erroneous admission of any given confession 'might be found harmless' " under *Chapman* if " 'the prosecution introduced . . . a videotape of the commission of the crime,' "  even though confessions " 'often operate "as a kind of evidentiary bombshell which shatters the defense" ' "]; *cf. Khoa Dang Nguyen v. McGrath* (N.D. Cal. 2004) 323 F.Supp.2d 1007, 1022 [Judge Breyer's observation, citing *Neal*, inter alia, that "video tape of a crime can provide just the kind of overwhelming evidence that would cause the erroneous admission of a confession to be a harmless error"].)

A harmless error analysis may include consideration of (a) implausible defense testimony, (b) disinterested eyewitnesses' testimony, and (c) closing argument. (See *People v. Fayed* (2020) 9 Cal.5th 147, 195 [harmless error because of "the overwhelming evidence of defendant's guilt and in light of the discredited, implausible testimony" of defendant's " 'star witness' "]; *People v. Zambrano* (2004) 124 Cal.App.4th 228, 243 [prosecutorial misconduct harmless in light of defendant's "patently unreasonable" testimony]; *People v. Torrez* (1995) 31 Cal.App.4th 1084, 1091 [harmless error in driving under the influence case where defense witness's "credibility was already challenged by his close friendship with [defendant] . . . and the . . . only disinterested eyewitness testified she clearly saw [defendant] driving the car"]; *People v. Flores* (2016) 2 Cal.App.5th 855, 881 ["inclusion of the legally erroneous theory was harmless beyond a reasonable doubt" in light of the evidence "and the closing arguments of counsel," and citing *People v. Aguilar* (1997) 16 Cal.4th 1023, 1036 for the proposition that a "court considers closing argument to evaluate whether legally erroneous alternative theory was harmless"].)

Here, video evidence presented to the jury showed defendant emerge from a garage after Penna's friend's car drove by, stand outside by the garage door for about five seconds, and go back inside. Then, about 11 seconds later, defendant emerged from the garage for the second time, crouched/kneeled between the garage door and a parked car for five or six seconds, then stood up and shot multiple times at Penna's car as it drove by. The sole disinterested witness testified that he saw defendant "kind of waiting for the car -- for a car to get there, to pass."

Defendant testified that when he was in the garage waiting for his friend to give him car keys and a cell phone (that defendant planned to give to his wife), a neighbor's daughter entered the garage, prompting defendant to "step[] out of the garage to try to take whatever potential gunfire or whatever was going to happen, and keep it away from her." Defendant twice affirmatively disagreed with the prosecutor's characterization that,

15

when he exited the garage the second time, he "crouched down low," insisting that "[w]hen [he] came out of the garage, [he] knew [Penna] was there with a gun." As Penna's car approached, defendant saw his wife push his son to the ground, where his daughter was sitting in a car seat, and defendant "st[ood] up out of the garage" and saw Penna "pointing a gun outside his passenger window." Seeing that, defendant tried to shoot the gun out of Penna's hand, as he "didn't want [Penna] to shoot towards [him] and [his] family."

In closing argument, the prosecutor used the videotape evidence, played it again for the jury, and contrasted the footage of an "ambush," with defendant's "utterly unreasonable" version of events, saying: "How long was [defendant] hunkered down there? How long is he squatting down there while . . . Penna is apparently pointing a gun at his wife? That behavior, that body language, just utterly does not comport with the story he is trying to spin for you in court."

Given (i) the compelling video footage showing defendant crouching and waiting for Penna's car to approach (buttressed by disinterested eyewitness testimony that defendant appeared to be waiting for the car), (ii) defendant's implausible testimony,[2] and (iii) the prosecutor's closing argument that relied heavily on the video footage, we conclude that any error as here alleged by defendant was harmless under any standard of review.

---

[2] Defendant's testimony that he exited the garage to "take . . . gunfire . . . and keep it away" from the neighbor's daughter was implausible given the video footage showing him crouching between a car and the garage door. A hidden figure does not draw gunfire.

Defendant's testimony that he (i) did *not* crouch down low, and (ii) "knew" Penna was "there with a gun" and pointing it at his family when defendant left the garage the second time, was implausible given the footage showing him *crouching for at least five seconds*.

16

## II

### *The Firearm Enhancement*

Defendant argues we should remand to permit the trial court to "consider imposing sentence under . . . section 12022.53, subdivision (b) or (c) in lieu of the life term imposed under subdivision (d)." Defendant further argues that, if we deem the claim forfeited, trial counsel was ineffective in failing to preserve it. The People argue defendant forfeited this claim by not raising it in the trial court, and that defendant cannot show ineffective assistance of trial counsel.

We conclude defendant forfeited this claim on appeal and has not demonstrated ineffective assistance of trial counsel.

### A. *Additional Background*

At the sentencing hearing held on June 28, 2019, defense counsel asked the trial court to "strike the use of the gun," "under the new law that enables [a trial court] to strike the use of the gun." The trial court declined to strike the enhancement, explaining: "I can't see that that would be just in any way, to take away that gun allegation. [Defendant] deserve[s] it, frankly, what [he] did."

### B. *Analysis*

Section 12022.53 provides three different sentence enhancements for the personal use of a firearm in the commission of enumerated offenses: a 10-year enhancement for the personal use of a firearm (§ 12022.53, subd. (b)); a 20-year enhancement for the personal and intentional discharge of a firearm (§ 12022.53, subd. (c)); and a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). Section 12022.53, subdivision (h), in effect at the time of defendant's June 2019 sentencing, authorizes the trial court to strike or dismiss an enhancement in the interest of justice pursuant to section 1385. Defendant contends the trial court failed to recognize its discretion to strike the 25-year-to-life enhancement under subdivision (d) and impose a lesser enhancement of 10 years under

17

subdivision (b) or 20 years under subdivision (c).  The record does not support defendant's contention.

Defendant's argument for remand rests on *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*), in which the court held that section 12022.53, subdivision (h) allows a trial court, in the exercise of its discretion, to strike a greater firearm enhancement and impose an uncharged lesser enhancement in the interests of justice pursuant to section 1385.  (*Morrison*, at pp. 220-223.)  Unlike the defendant in *Morrison*, defendant was charged with multiple firearm enhancements under section 12022.53, subdivisions (b), (c) and (d), each of which was found true.  Also, *Morrison* was published more than two months before the sentencing hearing in this case.  Thus, as defendant acknowledges, trial counsel *could have* raised a *Morrison* argument at sentencing.  Failure to do so forfeits the issue on appeal.  (*People v. Scott* (1994) 9 Cal.4th 331, 351.)

Defendant argues trial counsel was ineffective in failing to raise the issue at sentencing.  We disagree.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)  Regarding performance, if counsel's conduct can be reasonably attributed to sound strategy, a reviewing court will presume that the conduct was the result of a competent tactical decision, and the defendant must overcome that presumption to establish ineffective assistance.  (*People v. Fromuth* (2016) 2 Cal.App.5th 91, 113.)

Trial counsel expressly asked the trial court to exercise its discretion to "strike the use of the gun."  Defendant's contention that "[t]here can be no rational tactical reason" for counsel's failure to argue for a lesser firearm enhancement is unpersuasive, because

trial counsel could have reasonably believed that defendant had most to gain by framing the trial court's exercise of discretion as an "all-or-nothing" choice between a 25-year-to-life enhancement and no enhancement at all. If the trial court had been inclined to believe the 25-year-to-life enhancement was too harsh, the court might have stricken the enhancement entirely, reducing defendant's sentence for attempted murder from 32 years to life to 7 years to life. In contrast, an argument the trial court select one of the lesser enhancements might have produced a sentence of 17 years to life or 27 years to life. We cannot say trial counsel acted unreasonably in pursuing a strategy designed at achieving the best possible outcome for his client. We therefore reject the claim of ineffective assistance of counsel.

Further, nothing in the record suggests the trial court was unaware that striking the 25-year-to-life enhancement might leave the 20- and 10-year enhancements on the table. We presume the trial court knew and properly applied the governing law and conclude that remand is not required. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390 ["Absent evidence to the contrary, we presume that the trial court knew and applied the governing law"]; *Morrison, supra*, 34 Cal.App.5th at p. 225 ["after the publication of our decision today, the usual presumption that a sentencing court correctly applied the law will apply and will ordinarily prevent remand where the record is silent as to the scope of a court's discretion"].)

## DISPOSITION

The judgment is affirmed.

/s/
HOCH, J.

We concur:

/s/
RAYE, P. J.

/s/
HULL, J.